# In the United States Court of Federal Claims

No. 21-1065

(Filed Under Seal: June 25, 2021)

Reissued: July 12, 2021[1]

| | |
|---|---|
| SOPHION BIOSCIENCE, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| Defendant. | ) |
| | ) |

*Jonathan Perrone*, Whitcomb, Selinsky, PC, Denver, CO, for plaintiff.

*Daniel B. Volk*, U.S. Department of Justice, Civil Division, Washington, DC, for defendant.

## OPINION AND ORDER

**SMITH**, Senior Judge

This post-award bid protest is before the Court on the parties' Cross-Motions for Judgment on the Administrative Record. Plaintiff, Sophion Bioscience, Inc. ("Sophion"), challenges the evaluation of offerors and the award decision issued by the U.S. Department of Health and Human Services, Food and Drug Administration ("FDA" or "Agency") for a device called an automated high throughput patch clamp system ("APC" or "device" or "system") used to analyze heart ion channel pharmacology under Request for Quotation No. FDA-20-RFQ-1224178B, Amendment 3 ("RFQ" or "Solicitation"). Administrative Record 271–94 [hereinafter AR]. Specifically, plaintiff challenges the Agency's award to 3T Federal Solutions ("3T" or "awardee")[2], based on the following: (1) the RFQ contained a latent ambiguity; (2) construing that ambiguity against the Agency, the FDA conducted a flawed technical evaluation; (3) the FDA conducted evaluations based on unstated criteria; and (4) the FDA treated offerors unequally. *See generally* Plaintiff's Motion for Judgment on the Administrative Record, ECF No. 19 [hereinafter Pl.'s MJAR]. In response, defendant contends the following: (1) the RFQ is unambiguous; and (2) in the alternative, plaintiff's arguments serve as a challenge to the terms of the solicitation and, as such, are waived pursuant to *Blue & Gold Fleet, L.P. v. United States*, 492

---

[1]   An unredacted version of this opinion was issued under seal on June 25, 2021. The parties were given an opportunity to propose redactions, but no such proposals were made.

[2]   3T Federal Solutions ("3T" or "awardee") of Austin Texas is a distributor for manufacturer Nanion Technologies, GmbH of Munich Germany. Plaintiff's Motion for Judgment on the Administrative Record at 1, ECF No. 19 [hereinafter Pl.'s MJAR].

F.3d 1308 (Fed. Cir. 2007) ("*Blue & Gold*"). *See generally* Defendant's Response in Opposition to Plaintiff's Motion for Judgment upon the Administrative Record, and Cross-Motion for Judgment upon the Administrative Record, ECF No. 21[hereinafter Def.'s CMJAR]. For the reasons set forth below, the Court denies plaintiff's Motion for Judgment on the Administrative Record and grants defendant's Cross-Motion for Judgment on the Administrative Record.

## I.    Background

### A.    Solicitation

On April 22, 2020, the FDA issued its initial RFQ, No. FDA-20-RFQ-1224178A, for the procurement of an APC device. AR 1. The Solicitation indicated that the device would be utilized by the FDA's Division of Applied Regulatory Science "to protect and advance public health by ensuring drugs are safe and effective." AR 7–8. Specifically, the Solicitation provided that the device would "characterize drug effects on heart ion channels[,]" as APC systems automate a technique called manual patch clamping, a critical part of electrophysiology – the study of the electrical properties of cells and tissues in the body. AR 7. In simpler terms, to utilize the device, a researcher places a drug into the APC system, and the device simulates what effect it would have on the ion channels of a person's heart. *Id*.

After the receipt and evaluation of quotations, on June 9, 2020, the FDA published notice of its original contract award to 3T for a total contract value of $831,166.89. Complaint at 4, ECF No. 1 [hereinafter Compl.]. Subsequently, plaintiff and another competitor protested the award before the Government Accountability Office ("GAO"). *See id*. at 5; *see also* AR 196; AR 202. After reviewing the post-award protests, the FDA determined that the solicitation needed to be revised and took corrective action. AR 198, 218. On August 17, 2020, the FDA issued a revised RFQ, No. FDA-20-1224178B, to recompete the procurement. AR 227. On August 27, 2020, plaintiff filed a pre-award protest at the GAO, arguing that the revised solicitation was still not clear enough in various respects. AR 262–68. Upon review of that protest, the FDA decided to take corrective action once more to provide further clarifications. AR 269.

On September 11, 2020, the FDA amended the RFQ to its **final** iteration, FDA-20-RFQ-1224178B, Amendment 3. AR 271–94. This amendment contains the language at issue in this case. The RFQ anticipated awarding a firm-fixed price contract for a one-year base period of service/maintenance with four one-year option periods. AR 271, 75. Further, the RFQ provided for a best-value evaluation, prioritizing technical capability over price, based on two sets of evaluation factors. AR 292.

First, there were nine "Minimum Technical Capabilit[ies]," to be assessed on a pass/fail basis. AR 292–93. One of the requirements, pertinent to this case, required the APC device to "[r]ecord from *at least* 48 individual cells in single hole experiments per each run" – meaning that the device must contain at least 48 wells. AR 292 (emphasis added). Another required the APC device to have a minimum success rate of 20% – meaning that for a given test run, the system had to successfully measure at least 20% of the cells it had the capacity to measure. AR

293 ("Achieve seal resistance greater than or equal to 1 gigaohm and a **20% success rate**[.]") (emphasis added)).

For quotations that met the minimum requirements, the Solicitation stated that offerors would next be evaluated for "Performance Capability" on an adjectival basis. *Id*. The RFQ indicated that "[a] system will be given a higher technical consideration if it is capable of the following," listed in descending order of importance:

> 1. Can achieve higher **successful** throughput in single hole experiments per each run at $37\pm1°C$ on more than one of the 4 ionic currents that the FDA intends on studying (see link on these currents). Successful throughput is defined as the total number of cells achieving $\geq 1$ gigaohm seal without using seal enhancer or elevation of divalent cations to facilitate seal formation per each chip/plate, and that the ionic current elicited in that cell exhibits signs of adequate voltage control.
>
> 2. Can achieve higher **successful** throughput in single hole experiments per each run at $37\pm1°C$ on at least one of the 4 ionic currents that the FDA intends on studying (see link on these currents). Successful throughput is defined as the total number of cells achieving $\geq 1$ gigaohm seal without using seal enhancer or elevation of divalent cations to facilitate seal formation per each chip/plate, and that the ionic current elicited in that cell exhibits signs of adequate voltage control.
>
> 3. Can achieve higher **successful** throughput in single hole experiments per each run at $23\pm1°C$ on at least one of the 4 ionic currents that the FDA intends on studying. (see link on these currents). Successful throughput is defined as the total number of cells achieving $\geq 1$ gigaohm seal without using seal enhancer or elevation of divalent cations to facilitate seal formation per each chip/plate, and that the ionic current elicited in that cell exhibits signs of adequate voltage control.

AR 293–94 (emphasis in original). Central to this case is the meaning of the term "throughput," defined above. Finally, the RFQ stated that price would be evaluated on a "fair and reasonable" basis. AR 294.

After the issuance of the final RFQ, the FDA received questions, which it posted with answers on September 15, 2020. AR 299–301. Plaintiff submitted questions, generally asking why the FDA had decided on a minimum success rate lower than the industry standard for an APC device. AR 299–300. In its answers, the FDA explained that the solicitation's minimum requirement of a 20% success rate was based on the FDA's experimentation purposes. AR 300 ("Different context of use . . . [,][t]he FDA is not using the instrument for screening purpose.").

## B. Quotations

On September 16, 2020, the FDA received four timely quotations. AR 502. 3T submitted a quotation for its SyncroPatch 384i, a 384-well system. *Id*.; *see also* AR 372, AR 443. Plaintiff submitted the following three quotations: (1) one for its QPatch II, a 48-well system; (2) another for its Qube 384, a 384-well system, and (3) lastly for a combination of those two devices. AR 502; *see also* AR 306. Simultaneously, plaintiff filed an agency-level protest

with the FDA, generally contesting the RFQ's evaluation criteria – which was promptly denied on October 21, 2020. AR 302–03; AR 304–05.

The following quotations met the solicitation's minimum requirements: (1) 3T's SyncroPatch 384i for a total contract value of $727,119.45, and (2) plaintiff's QPatch II for a total contract value of $740,338.00. AR 502–07; *see also* AR 511; Compl. at 5. However, the FDA determined that 3T's quotation represented the better value under the criteria set forth in the RFQ. AR 507–08; AR 511. This is because 3T's SyncroPatch 384i received a better technical rating based upon its ability to record higher numbers of total cells per run and had a capability of recording more than one ionic channel at 36ºC. AR 507–08; *see also* Def.'s CMJAR at 6. Further, 3T quoted a lower price. AR 511. On December 11, 2020, plaintiff was notified that the contract was once again awarded to 3T. *Id.*

### C. Current Procedural History

On December 18, 2020, plaintiff filed a post-award protest at the GAO, arguing that the FDA had unfairly favored 3T. AR 521. On February 25, 2021, the GAO dismissed plaintiffs' protest, ruling that it was an untimely challenge to the terms of the RFQ. AR 538, 540. This protest followed. On March 15, 2021, plaintiff filed its Complaint with this Court, seeking declaratory and injunctive relief. *See generally* Compl. On April 12, 2021, plaintiff filed its Motion for Judgment on the Administrative Record. *See generally* Pl.'s MJAR. On April 26, 2021, defendant filed its Response and Cross-Motion. *See generally* Def.'s CMJAR. On May 3, 2021, plaintiff filed its Reply and Response. *See generally* Plaintiff's Response and Reply in Support of its Motion for Judgment on the Administrative Record, ECF No. 23 [hereinafter Pl.'s Resp.]. On May 10, 2021, defendant filed its Reply. *See generally* Defendant's Reply in Support of its Cross-Motion for Judgment Upon the Administrative Record, ECF No. 25 [hereinafter Def.'s Reply]. The Court held oral argument on June 9, 2021. The parties' Motions are fully briefed and ripe for review.

### II. Standard of Review

This Court's jurisdictional grant is found primarily in the Tucker Act, which provides the Court of Federal Claims with the power "to render any judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States . . . in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (2012). Although the Tucker Act explicitly waives the sovereign immunity of the United States against such claims, it "does not create any substantive right enforceable against the United States for money damages." *United States v. Testan*, 424 U.S. 392, 398 (1976). Rather, to fall within the scope of the Tucker Act, "a plaintiff must identify a separate source of substantive law that creates the right to money damages." *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc in relevant part).

The Tucker Act also affords this Court with jurisdiction over bid protest actions. 28 U.S.C. § 1491(b). This Court evaluates bid protests under the Administrative Procedure Act's ("APA") standard of review for agency actions. *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005) (citing *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)). Under APA standards, agency procurement

actions may be set aside if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 28 U.S.C. § 1491(b)(4); 5 U.S.C. § 706(2)(A).

Under Rule 52.1 of the Rules of the Court of Federal Claims ("RCFC"), a party may file a motion for judgment upon the administrative record for the Court to assess whether an administrative body, given all disputed and undisputed facts in the record, acted in compliance with the legal standards governing the decision under review. *See Supreme Foodservice GmbH v. United States*, 109 Fed. Cl. 369, 382 (2013) (citing *Fort Carson Supp. Servs. v. United States*, 71 Fed. Cl. 585 (2006)). On a motion for judgment upon the administrative record, the parties are limited to the Administrative Record, and the Court makes findings of fact as if it were conducting a trial on a paper record. RCFC 52.1; *Bannum*, 404 F.3d at 1354. Looking to the Administrative Record, the Court must determine whether a party has met its burden of proof based on the evidence in the record. *Bannum*, 404 F.3d at 1355.

## III.    Discussion

### A.    Ambiguities & the Doctrine of Waiver

First, plaintiff asserts that the concept of "throughput," as referenced in the RFQ, constituted a latent ambiguity, and as such, should be construed against the Agency. Pl.'s MJAR at 14–15; *see also Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1312 (Fed. Cir. 2016) ("[A] latent ambiguity is a hidden or concealed defect which is not apparent on the face of the document, could not be discovered by reasonable and customary care, and is not so patent and glaring as to impose an affirmative duty on plaintiff to seek clarification.") (citations omitted)). Specifically, plaintiff claims that the FDA utilized the term "throughput" in the RFQ to describe an APC device's capacity, rather than efficiency. Pl.'s MJAR at 12; *see also* AR 293–94. However, plaintiff refers to various points of the RFQ and numerous dictionary definitions of the term to demonstrate that "the conventional understanding of throughput is as a measure of *efficiency* – the number of things that can be [successfully] processed . . . in a given interval of time." Pl.'s MJAR at 11 (emphasis in original); *see also* AR 293 ("If the Offeror has met the Minimum Technical Capability (pass), it will be evaluated for the ***efficiency*** of its system/performance capability.") (emphasis added). Based on the above, plaintiff asserts that the concept of throughput as referenced in the RFQ constituted a latent ambiguity because its true meaning could not have been known before the award. Pl.'s MJAR at 14; *see also* AR 507–08.

Defendant counters that the concept of "throughput," as referenced in the RFQ, is unambiguous. Def.'s CMJAR at 12. This is because the RFQ "plainly stated that successful throughput would be assessed based on the 'total number of cells,' not the percentage of successful cells." *Id.* (citing AR 293). Consequently, defendant avers that plaintiff's references to extrinsic definitions are unpersuasive as "one cannot resort to generic dictionary definitions to contradict . . . that [which] was included in the solicitation for the specific purpose at issue." *Id.* In the alternative, defendant asserts that to the extent plaintiff has established any ambiguity as to the meaning of "throughput," it should be deemed patent and, as such, waived pursuant to *Blue & Gold*. *Id.* at 12–13; *see also Per Aarsleff A/S*, 829 F.3d at 1312 ("A defect is patent if it is an obvious omission, inconsistency or discrepancy of significance.") (internal citations omitted); *Blue & Gold*, 492 F.3d at 1313 ("[A] party who has the opportunity to object to the terms of a

government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the [Claims Court].").

It is well-settled precedent that "[c]ontract interpretation begins with the language of the written agreement." *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (citation omitted). Thus, the Court's first task entails an examination of the "plain language of the [solicitation]" term at issue. *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1353 (Fed. Cir. 2004). "If the provision[] of the solicitation [is] clear and unambiguous, [it] must be given [its] plain and ordinary meaning." *Id.* (citations omitted). However, if the Court determines that the contract language at issue is ambiguous, the Court's next task is to "determine whether that ambiguity was patent so as to impose a duty to seek clarification, or only latent." *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 997 (Fed. Cir. 1996) (citations omitted).

Accordingly, the Court begins its analysis with an examination of the plain text of the Solicitation term at issue. In relevant part, the RFQ defines "throughput" as follows:

> 1. Can achieve **higher** successful throughput in single hole experiments per each run at $37\pm1°C$ on more than one of the 4 ionic currents that the FDA intends on studying (see link on these currents). **Successful throughput is defined as the *total number of cells* achieving ≥ 1 gigaohm seal without using seal enhancer or elevation of divalent cations to facilitate seal formation per each chip/plate, and that the ionic current elicited in that cell exhibits signs of adequate voltage control.**

AR 293 (emphasis added); *see also* AR 294.

After a thorough review of the RFQ and the record, the Court agrees with defendant's first argument and finds that the term "throughput," as referenced in the solicitation, is unambiguous. The context of the RFQ supports the Court's interpretation because the RFQ explicitly defines "throughput" as *the total number of cells* achieving ≥ 1 gigaohm seal without using seal enhancer[.]" AR 293–94 (emphasis added). Plaintiff's interpretation of the above as meaning efficiency is simply inconsistent with the Solicitation's plain text. Consequently, the Court finds plaintiff's references to various points of the RFQ and generic dictionary definitions unavailing in demonstrating any ambiguity. *See Banknote Corp. of Am.*, 365 F.3d at 1353 ("[W]e must consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions.") (citation omitted); *see also Coast Fed. Bank, FSB*, 323 F.3d at 1038. Further, the Court notes that, even assuming an ambiguity exists, it would be considered patent and, as such, waived in accordance with *Blue & Gold*. 492 F.3d at 1313 ("[A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the [Claims Court]."). Nonetheless, the Court need not address this alternative argument because the Court finds that the term "throughput," as referenced in the Solicitation, is unambiguous. As the Court has

determined that the concept of "throughput" as referenced in the RFQ is unambiguous, the Court need not address plaintiff's technical arguments.[3]

## B. Unstated Evaluation Criteria

Next, plaintiff asserts that the Agency applied unstated evaluation criteria when it prioritized a 384-well system over a 48-well system and failed to include the above in the RFQ. Pl.'s MJAR at 22. In support of its argument, plaintiff refers to an August 6, 2020 internal email chain between a member of the source selection authority, contracting officer, and FDA scientist discussing the same. *Id.* at 22–23 (citing AR 220–22); *see also* AR 220 ("[A]n instrument that records from 48 cells only is 1/8 the efficiency of an instrument that records from 384 cells, assuming all technical aspects remain equal. That means FDA needs to put in 8X the manhours to operate the lower throughput instrument to get the same number of recordings."). Plaintiff posits that the email chain demonstrates that the "FDA sought to purchase a 384-well system from the outset, but did not disclose its intentions." Pl.'s MJAR at 23; *see* AR 292 (Minimum requirement establishing that the APC device "[r]ecord from at least *48* individual cells in single hole experiments per each run.") (emphasis added). Finally, plaintiff avers that it was prejudiced because had it known that the FDA considered 48-well systems to be vastly inferior to 384-well systems, Sophion could have focused on configuring its own 384-well device. Pl.'s MJAR at 24.

In response, defendant asserts that plaintiff's attempt to portray its bidding mistake as the result of some undisclosed evaluation factor is unavailing, as "the inherent disadvantage of a 48-well system in comparison to a 384-well system for purposes of this procurement was easily discernable" based on the plain text of the RFQ. Def.'s CMJAR 18–19; *see also* AR 293–94 ("Successful throughput is defined as *the total number of cells* achieving ≥ 1 gigaohm seal without using seal enhancer[.]") (emphasis added).

"It is hornbook law that agencies must evaluate proposals and make awards based on the criteria stated in the solicitation." *NEQ, LLC v. United States*, 88 Fed. Cl. 38, 47 (2009) (internal citations omitted). "It thus is beyond peradventure that the government may not rely upon undisclosed evaluation criteria in evaluating proposals." *Id.* at 48 (citation omitted). Nevertheless, "to prevail on an argument that an agency used an unstated evaluation criterion, a protester must show that: (i) 'the procuring agency used a significantly different basis in

---

[3]       Construing the ambiguity against the agency, *i.e.*, defining throughput as efficiency instead of capacity, plaintiff challenges the Agency's technical evaluation based on the following: (1) the FDA improperly credited 3T with demonstrating a higher throughput because a lower rate of successful cells would require the FDA to re-perform its research tests; and (2) the FDA improperly credited 3T with a lower price for consumable plates because a lower rate of successful cells would require the FDA to re-perform its research tests, resulting in a higher cost per valid data point acquired. *See* Pl.'s MJAR at 15–22. Upon a comprehensive review of the record, the Court finds the Agency's technical evaluation was neither arbitrary nor capricious, and, thus, declines to set aside those evaluations now. *See* AR 507–08; AR 511; *see also Tech. Innovation All. LLC v. United States*, 149 Fed. Cl. 105, 139 (2020) ("The Court's scope of review is particularly narrow when it comes to agency judgments regarding the technical merits of particular proposals.").

evaluating the proposals than was disclosed; and (ii) the protester was prejudiced as a result[.]'" *Id.* (citing *Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 387 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004)); *see also Summit Techs., LLC v. United States*, 151 Fed. Cl. 171, 181 (2020).

Contrary to plaintiff's claims and as indicated above, the RFQ unambiguously defined successful throughput "as ***the total number of cells*** achieving ≥ 1 gigaohm seal without using seal enhancer[.]" AR 293–94 (emphasis added). Consequently, the Court concludes that the inherent drawback of a 48-well system in comparison to a 384-well system for purposes of this procurement, assuming all technical aspects remain equal, was readily apparent. *See also NEQ, LLC*, 88 Fed. Cl. at 48 ("[I]t is well-settled that a solicitation need not identify each element to be considered by the agency during the course of the evaluation where such element is intrinsic to the stated factors.") (internal citations omitted). Thus, the email exchange referenced by plaintiff fails to demonstrate an unstated requirement. AR 220–22.

Further, upon a comprehensive review of the record, the Court finds that the Agency's evaluation was consistent with the terms of the solicitation. AR 502–07. Accordingly, the Court construes plaintiff's argument as a challenge to the solicitation's terms, if not a failed attempt to re-draft the RFQ to its liking. *See Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010) ("[C]ompetitors do not dictate an agency's minimum needs[.]") (citation omitted). Therefore, by not raising the issue in a pre-award protest, plaintiff waived its challenge pursuant to *Blue & Gold*. *See Blue & Gold*, 492 F.3d at 1313; *see also COMINT Sys. Corp. v. United States*, 700 F.3d 1377, 1381 (Fed. Cir. 2012). As such, the Court does not believe that the protestor was prejudiced and declines to set aside the award.

## C. Unequal Treatment

Additionally, plaintiff argues that the FDA engaged in unequal treatment in its evaluation of temperature requirements because it "found fault in Sophion's quotation, where it took 3T at its word." Pl.'s MJAR at 25. Particularly, plaintiff asserts that the "FDA nitpicked data supporting [its] device's capability," while ignoring the fact that "3T did not supply such data at all." *Id.*; *see also* AR 507 (Evaluation of plaintiff's proposal indicating "CaV1.2 discounted as this was done at 35C per word doc and ppt slide."); AR 433 (3T's proposal providing experiment results at 36°C.). In response, defendant avers that plaintiff fails to demonstrate unequal treatment for the following reasons: (1) "Sophion's unequal treatment argument is based on dissimilar [temperature] issues;" and (2) "the administrative record demonstrates that the FDA also 'took [Sophion] at its word' regarding the data submitted." Def.'s CMJAR at 19; *see also* AR 293 (Evaluation criteria stating "[a] system will be given a higher technical consideration if it is capable of . . . achiev[ing] higher successful throughput . . . per each run at 37 ±1°C on more than one of the 4 ionic currents that the FDA intends on studying[.]"); *id.* (Minimum requirement establishing "[s]table temperature control to allow recording at 23 ±1°C and 37 ±1°C.").

It is well-established that "a contracting agency must treat all offerors equally, evaluating proposals evenhandedly against common requirements and evaluation criteria." *Banknote Corp. of Am.*, 56 Fed. Cl. at 383 (citations omitted). Thus, "[t]o prevail [on an unequal treatment claim], a protestor must show that the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained

in other proposals," or that "the agency inconsistently applied objective solicitation requirements between it and other offerors, such as proposal page limits, formatting requirements, or submission deadlines." *Office Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020) (citing *Enhanced Veterans Solutions, Inc. v. United States*, 131 Fed. Cl. 565, 588 (2017)). "If a protestor does not [meet this threshold], then the court should dismiss the claim. To allow otherwise would give a court free reign [sic] to second-guess the agency's discretionary determinations underlying its technical ratings." *Id.* at 1373.

Upon a careful review of the record, it is clear to the Court that the Agency's evaluation of quotations was not unequal. To begin with, the RFQ provided that "[a] system will be given a higher technical consideration if it is capable of . . . achiev[ing] higher successful throughput . . . per each run at $37\pm1\,°C$ on *more than one* of the 4 ionic currents that the FDA intends on studying[.]" AR 293 (emphasis added). However, unlike 3T, plaintiff submitted data demonstrating that its device could do this for *only one* ionic channel – which it was rightfully discounted for by the FDA. *See* AR 507. Nevertheless, plaintiff maintains that the FDA treated 3T unequally by not requiring independent confirmation of 3T's technical representations and data demonstrating stable temperature control – provided in relation to a separate requirement. Pl.'s MJAR at 25; *see also* AR 293; AR 433.

Ultimately, the Court finds the referenced temperature requirements unrelated and, as such, concludes that plaintiff has not properly asserted that the Agency rated a "substantively indistinguishable or nearly identical" aspect of 3T's quotation differently. *Office Design Grp.*, 951 F.3d at 1372 (internal citations omitted). Further, upon a comprehensive review of the record, it is evident that the FDA applied the solicitation's evaluation criteria equally to the data and representations both offerors provided. *See* AR 502–07. As nothing in the record supports plaintiff's assertions that the evaluation was unequal and irrational, the Court will not endeavor to set it aside now.

### D. Prejudice and Injunctive Relief

Lastly, plaintiff alleges that it was prejudiced because, "but for [the] FDA's errors in evaluating the quotations . . . , Sophion's QPatch II would have been rated higher than [] [3T's] SyncroPatch 384i." Pl.'s MJAR at 29. However, as defendant points out, plaintiff "simply disagrees with the FDA, which does not suffice to demonstrate that the agency acted irrationally." Def.'s CMJAR at 14; *see also E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996) ("Officials have substantial discretion to determine which proposal represents the best value for the Government.") (citations omitted). This Court is generally loath to "disturb a best-value award so long as the agency 'documents its final award decision and includes the rationale for any business judgments and tradeoffs made.'" *Afghan Am. Army Servs. Corp. v. United States*, 90 Fed. Cl. 341, 360 (2009) (quoting *Blackwater Lodge & Training Ctr. v. United States*, 86 Fed. Cl. 488, 514 (2009)) (citation omitted). So long as there exists a "rational connection between the facts found and the choice made," the Court will not set a procurement decision aside. *Banknote Corp. of Am.*, 56 Fed. Cl. at 390 (quoting *Motor Vehicle Mfrs. Ass'n v. State farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). As the Court is not persuaded by plaintiff's contentions that the Agency conducted a flawed evaluation and award, the Court does not believe that plaintiff was prejudiced by such alleged procurement flaws.

Finally, plaintiff alleges that it is entitled to permanent injunctive relief.  Pl.'s MJAR at 28.  When analyzing whether a permanent injunction is proper, a court must analyze "whether, as it must, the plaintiff has succeeded on the merits of the case."  *PGBA, LLC v. United States*, 389 F.3d 1219, 1229 (Fed. Cir. 2004).  As the plaintiff did not succeed on the merits of its case, there is no need to consider an injunction.

## IV.     Conclusion

For the reasons set forth above, plaintiff's MOTION for Judgment on the Administrative Record is hereby **DENIED**.  Defendant's CROSS-MOTION for Judgment on the Administrative Record is hereby **GRANTED**.  The Clerk is directed to enter judgment in favor of defendant, consistent with this opinion.

**IT IS SO ORDERED.**

s/ *Loren A. Smith*

Loren A. Smith
Senior Judge